Filed 7/25/25  P. v. Voravongsa CA1/4
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BRIAN KHAMSOUK VORAVONGSA,<br><br>      Defendant and Appellant. | A170022<br><br>(Lake County<br>Super. Ct. No. CR961937) |

Brian Khamsouk Voravongsa was convicted of being a felon in possession of a firearm and sentenced to four years in state prison.  He contends that his conviction must be reversed because it violates his Second Amendment right to possess a firearm under *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  We find no error and affirm.

### BACKGROUND

Voravongsa was charged by amended information with, among other counts, being a felon in possession of a firearm (Pen. Code[1] § 29800, subd. (a)(1)).  The information further alleged that Voravongsa had been convicted of a prior serious and/or violent

---

[1] All undesignated statutory references are to the Penal Code.

felony (§§ 667, subd. (d)), and alleged several aggravating sentencing factors (Cal. Rules of Court, rule 4.421(a)(2), (b)(1)–(5)).

Following a trial, the jury found Voravongsa guilty of the above offense and the court found true the prior serious felony allegation as well as the allegations that his prior convictions were numerous or of increasing seriousness, that he had served a prior prison term, and that his prior performance on probation or parole was unsatisfactory.[2]

The trial court denied Voravongsa's request to strike his prior conviction and sentenced him to four years in state prison.

## DISCUSSION

Voravongsa contends that his conviction under section 29800, subdivision (a) violates his Second Amendment right to possess a firearm. (U.S. Const., 2d Amend.) Because he raises a facial challenge to the constitutionality of the statute, which requires us to " 'consider "only the text of the measure itself, not its application to the particular circumstances of an individual," ' " his "challenge may be raised and decided for the

---

[2] Voravongsa was also charged with a second count of being a felon in possession of a firearm, possession of methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1, subd. (a)) and unlawful possession of ammunition (§ 30305, subd. (a)(1)), with various related enhancement allegations, including that he was released on bail or his own recognizance when he committed the offenses (§ 12022.1). These counts and the on-bail enhancement allegation were dismissed by the court under section 1118.1 or by the prosecutor.

2

first time on appeal." (*People v. Anderson* (2024) 104 Cal.App.5th 577, 589 (*Anderson*).)

In *Bruen*, *supra*, 597 U.S. 1, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen*, 597 U.S. at p. 17.)

There is, as Voravongsa argues, "a split among California Courts of Appeal as to whether the challenged conduct— possession of a firearm by a felon—is covered by the Second Amendment." Several courts have held that "only law-abiding citizens are included among 'the people' whose right to bear arms is protected by the Second Amendment." (*People v. Alexander* (2023) 91 Cal.App.5th 469, 478; *People v. Odell* (2023) 92 Cal.App.5th 307, 317 [agreeing]; *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1301 [same].) In *Anderson*, *supra*, 104 Cal.App.5th at p. 589, the court disagreed, holding that "the Second Amendment applies to [the] defendant notwithstanding his status as a felon, and presumptively protects his right to possess a loaded firearm." Nonetheless, in *Anderson*, the court rejected the defendant's facial challenge to section 29800, subdivision (a)(1), based on its finding that California's felon-in-

3

possession firearm regulation is " 'consistent with the principles that underpin' the nation's historical tradition of firearm regulation." (*Anderson*, at p. 589.)

Voravongsa argues that this court should adopt the first conclusion in *Anderson*—that the Second Amendment applies to felons—but not its second. He suggests that the *Anderson* court did not "properly apply the historical analysis *Bruen* requires and has not shown that California's felon dispossession statutes are constitutional under *Bruen*." We need not decide whether the felons are excluded from the class of people protected by the Second Amendment because we agree with the court in *Anderson* that section 29800, subdivision (a)(1), is consistent with our nation's historical tradition of firearm regulation.

In *Anderson*, the court detailed that historical tradition by analyzing "sources from 17th-century England, colonial America, and the early federal period" before concluding that "this nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony." (*Anderson*, *supra*, 104 Cal.App.5th at pp. 589–595, 599.)

First, the court observed that early English legal history included the adoption of the English Bill of Rights, which placed limitations on who could bear arms based on, for example, religion, ownership of property, and " 'as allowed by Law.' " (*Anderson, supra*, 104 Cal.App.5th at pp. 589–591.) The court concluded, "In short, English law required the legislature to respect certain people's liberties, but those liberties were still subject to moderate and sensible regulation." (*Id.* at p. 591.)

Second, the Court observed that the "English tradition of disarming those whom Parliament did not trust to be law-abiding or loyal members of society carried over to the American colonies and persisted as the colonies became new states." (*Anderson*, *supra*, 104 Cal.App.5th at p. 591.) The court noted that one's race or religion, for example, was grounds for disarmament; hence, Native Americans, African Americans, and Catholics had no right to bear arms. But, in addition to these "odious" laws which would today violate our state and federal constitutions, the court cited evidence showing that "[d]isarmament was also an accepted sanction for an individual's criminal behavior in colonial America." (*Id.* at p. 592.)

Next, the court observed that, in the early federal period, while Pennsylvania's, North Carolina's, Vermont's, and Massachusetts's state constitutions gave the people the right to bear arms, including for defensive purposes, those rights were not unconditional. (*Anderson, supra*, 104 Cal.App.5th at pp. 593–594.) Pennsylvania and North Carolina passed statutes disarming citizens for refusing to take a loyalty oath, and Massachusetts's legislature "imposed disarmament as a sanction for participants in Shays' Rebellion." (*Anderson*, at p. 594.) The court explained, "The lesson we draw from this historical evidence is that the founding generation did not consider the constitutional right to arms inherited from the English legal tradition to be inconsistent with legislative enactments disarming individuals convicted of serious crimes or otherwise dangerous to the community." (*Ibid.*)

5

Finally, the court cited amendments to the United States Constitution proposed, but not adopted, at ratifying conventions in Pennsylvania and Massachusetts which sought to secure the right to bear arms for "peaceable citizens" and precluded laws "disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." (*Anderson, supra*, 104 Cal.App.5th at pp. 594, 595.) The court reasoned that its conclusion was "confirmed" by these "historical accounts of deliberations over whether to ratify the federal Constitution." (*Id.* at p. 594.)

Initially, Voravongsa faults the court for applying a "thematic approach" and combining "separate categories of historical evidence." He cites the court's conclusion that "[t]aken together," the historical evidence "shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence. California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes." (*Anderson, supra*, 104 Cal.App.5th at p. 598.) He argues that "bundling distinct regulations together," neither of which is sufficient on its own to serve as a representative historic analogue, does not satisfy the inquiry required under *Bruen.* We disagree.

In *Bruen,* the court held that in showing that a challenged law is consistent with our nation's historical tradition of firearm regulation, the government need not identify a "historical twin"

6

to a challenged law. (*Bruen, supra*, 597 U.S. at p. 30.) Rather, the government must only identify a "well-established and representative historical analogue." (*Ibid*.) *Bruen* directs courts to use history as our guide in determining whether a present-day firearm regulation was "unimaginable at the founding." (*Id*. at p. 28.) "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are " 'relevantly similar.' " (*Id*. at pp. 28–29.) Among the metrics courts should consider in evaluating whether modern and historic regulations are similar are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." (*Ibid*.)

In *United States v. Rahimi* (2024) 602 U.S. 680, 690–691 (*Rahimi*) the court applied the *Bruen* standard to uphold the constitutionality of section 922(g)(8) of title 18 of the United States Code, which prohibits an individual subject to a domestic violence restraining order from possessing a firearm under certain conditions. The court offered additional guidance on how to apply *Bruen's* framework noting that "some courts have misunderstood the methodology of" *Bruen*, which was not "meant to suggest a law trapped in amber." (*Rahimi*, at p. 691.) The court clarified that "the appropriate analysis involves considering whether the challenged regulation is consistent with the

7

*principles* that underpin our regulatory tradition." (*Id*. at p. 692, italics added.)

Voravongsa also contends that "[e]ven if the *Anderson* court's approach is sound, its historical evidence is not relevantly similar." He argues that the categorical disarmament laws based on race and religion are not comparable because they were based on who were considered "the people" at that time and do not "say anything about the colonial era views on the scope of the right to bear arms." The *Anderson* court disagreed. The court acknowledged the limitations of this evidence but concluded that "the point remains that these historical practices show the generation that adopted the Second Amendment understood the right it was enshrining in the Constitution to be limited" and that "[t]he right to arms familiar to them allowed for . . . categorical disarmament of groups that the legislature assessed as threatening to the community." (*Anderson, supra,* 104 Cal.App.5th at p. 598.) While this category of historical evidence alone might not establish the constitutionality of current felon-in-possession statutes, we disagree that these regulations are irrelevant to the analysis.

Voravongsa also argues that the court's reliance on historic disarmament laws based on individual criminal conduct was misplaced because many of the sources imposed only temporary firearm bans and "[e]ven where the loss of the right was permanent, . . . none of the *Anderson* court's evidence shows that sufficiently 'serious' crimes, comparable to a felony conviction, resulted in disarmament. Rather, the evidence shows that the

8

common thread running through all the court's purported analogues, whether they involved the commission of a crime or not, is at *most* that *dangerous* people can be disarmed, not those who have broken sufficiently 'serious' laws."

Initially, the court in *Anderson* rejected the argument that the fact that "some of the statutes and criminal penalties requiring a person to forfeit arms fell short of a lifetime ban on possessing arms" compelled a different result. (*Anderson, supra*, 104 Cal.App.5th at pp. 595–596.) The court explained that "section 29800 imposes a similar burden on the right to arms as do these historical analogues. As with the categorical disarmament laws, section 29800's deprivation of rights is complete for those assessed unwilling to respect sovereign authority, but the statute does not 'restrict arms use by the public generally.' [Citation.] As with the criminal penalty of disarmament, section 29800 deprives an individual of weapons only after he or she has been convicted in a court of law, with all the attendant protections of due process. And while defendant is correct that, historically, disarmament as a criminal penalty was sometimes temporary, this appears not always to have been the case. [Citation.] In any event, categorical disarmament laws imposed permanent prohibitions (at least while the laws themselves lasted)." (104 Cal.App.5th at p. 598.) We find no fault in the court's reasoning.

The court also rejected the argument that, historically, criminal disarmament turned on whether the criminal conduct was violent rather than merely unlawful. The court cited

9

evidence showing that an individual could be "disarmed as a sanction for criminal conduct, whether or not involving physical violence." (*Anderson, supra*, 104 Cal.App.5th at pp. 592–593, 598.) The court also noted, however, that given that the defendant's felony conviction was for a violent offense and he was asserting a facial challenge to the statute, it was unnecessary to differentiate between violent felonies and nonviolent felonies. (*Id*. at pp. 595–596, fn. 2.) The court explained, "Because the challenge before us is a facial challenge, 'to prevail, the Government need only demonstrate that [the statute] is constitutional in some of its applications.' " (104 Cal.App.5th at p. 600.) The court in that case had no trouble concluding that in the founding era, the defendant could have been disarmed as punishment for at least one of his crimes: maliciously and intentionally shooting at an inhabited dwelling or motor vehicle (§ 246); assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)); and being a felon in possession of a firearm (§ 12021, subd. (a)(1)). (*Anderson,* 104 Cal.App.5th at p. 600.) Here, given that Voravongsa also asserts a facial challenge and that his prior strike conviction was for discharging a firearm in a grossly negligent manner (§ 246.3), we too need not differentiate between violent and nonviolent felonies and have no trouble concluding that in the founding era, Voravongsa could have been disarmed as punishment for his offense.[3]

---

[3] Voravongsa's prior strike offense is summarized in the probation report as follows: "According to probation records, a deputy responded to a reported drive-by shooting and was

10

Finally, Voravongsa argues that the court's reliance on the proposed constitutional amendments was misplaced. He argues that relying on proposed provisions that were not adopted provides no "support at all" for the court's holding and that, to the extent the proposed provisions sought to protect the rights of law-abiding citizens to keep and bear arms rather than to disarm criminals, they are not relevant. The court expressly rejected this argument in *Anderson*: "That argument misunderstands the dynamic of those debates. What both states voted down in their conventions was the idea that the federal Constitution should only be ratified if amended to include a declaration of rights. [Citation.] Among those rights was the right to arms we have discussed, but there is no evidence that the precise formulation of that right was itself controversial. Review the many pages of records available from the Pennsylvania ratifying convention, and you will find no disagreement with the articulated proposition that the right to arms with which the delegates were familiar had an exception, allowing disarmament for 'crimes

_____

informed by the 14-year-old victim three gunshots were fired from the front of his residence as he slept. . . . It was learned the victim's current girlfriend (M.N.) had a prior relationship and a child with the defendant. She was contacted and noted the defendant previously called her, stating, 'Come get the baby, I'm going to kill [the victim].' [W]hen M.N. went to pick up their child, the defendant showed her a gun in his waistband. She attempted to talk him out of it; however, he reported, 'It had to be done.' M.N. drove alongside the defendant as he rode his bicycle to the victim's residence. She drove ahead and once at the victim's residence, told the defendant not to do it. The defendant removed the firearm from his waistband and fired three shots at the victim's residence. He then rode away."

committed' or to protect the community against 'danger of public injury.' [Citation.] And, of course, after the Constitution was adopted the Pennsylvania Antifederalists won their declaration of rights with the adoption of our Bill of Rights, including the Second Amendment. [¶] We read the evidence from the Pennsylvania and Massachusetts ratifying conventions as confirming what the historical analogues have already established: that this nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony." (*Anderson, supra,* 104 Cal.App.5th at p. 599.) We find no error in the court's conclusion that the evidence is relevant.

Voravongsa argues that "[e]ven if such a proposal could provide useful information about the scope of the right under *Bruen,*" the founding generation would have understood the criminal conduct that might lead to disarmament as referring not "to all crimes but rather to those 'of a deeper and more atrocious' kind," or those that pose a " 'real danger of public injury.' " As with his argument above that historic provisions providing for disarmament for criminal conduct were concerned with dangerousness not unlawfulness, this argument also fails in a facial challenge. Voravongsa's prior strike conviction was both serious under the law and reflects dangerousness. Accordingly, even if the exception recognized in the proposed provisions was addressed to dangerousness and not merely unlawfulness, it supports the court's conclusion that section 29800,

12

subdivision (a)(1), comports with the principles that underpin our regulatory tradition.

Accordingly, we reject Voravongsa's facial challenge to section 29800, subdivision (a)(1), and affirm his conviction.

## DISPOSITION

The judgment is affirmed.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
CLAY, J. *

STREETER, J., Concurring.

I join Justice Goldman's opinion, except that, rather than pass over the question whether felons are presumptively included within the term "the People" in the Second Amendment, I would agree with Presiding Justice Tucher's opinion in *Anderson*, *supra*, 104 Cal.App.5th 577 on that point, and hold that they are.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.